UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

NYCOMED US INC.,

Plaintiff,

v.

GLENMARK GENERICS LTD., and
GLENMARK GENERICS INC., USA

Defendants.

Civ. Action No. 08-5023 (CBA, RLM)

**CONFIDENTIAL**
**FILED UNDER SEAL**

## PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

Table of Contents

Page

I.  THE CLAIM CONSTRUCTION DISPUTES BEFORE THE
    COURT .................................................................................................................1

    A.  The Origin Of The Claim Construction Disputes Was The
        Failure Of Glenmark's Mineral Oil Noninfringement
        Defense At The Pleading Stage ............................................................3

    B.  Glenmark's New And Untimely Defenses Are The Reasons
        That Glenmark Now Puts Most If Not All Of The Claim
        Terms In Issue.........................................................................................5

II. THE UNDERLYING EVIDENCE CONCERNING CLAIM
    CONSTRUCTION SUPPORTS THE USE OF THE ORDINARY
    MEANING OF THE TERMS OR THE DEFINITIONS OF THE
    TERMS USED IN THE SPECIFICATION ......................................................5

    A.  The Lotion Invention Was Novel And Not Predicted ...........................5

    B.  Identification Of The Asserted Claims .................................................7

        1.   Independent Claims 1 And 19.....................................................7

        2.   Dependent Claims 2-18................................................................8

    C.  The '669 Patent Specification Is The Best Guide..................................8

    D.  The Prosecution History Is Less Relevant And Is Generally
        Not Controlling For The Terms In Issue.................................................9

III. THE LAW OF CLAIM CONSTRUCTION SUPPORTS
     NYCOMED'S APPROACH TO THE CLAIMS BY ASSERTING
     THE ORDINARY MEANING OF THE TERMS EXCEPT IN
     THE FEW CASES WHERE THE TERMS WERE PROVIDED
     SPECIFIC DEFINITIONS IN THE SPECIFICATION...................................10

    A.  Claim Terms Are Presumptively Given Their Ordinary
        Meaning ...............................................................................................10

    B.  Dependent Claims Provide Guidance For Interpreting
        Independent Claims .............................................................................11

    C.  The Definition Of A Term May Be Provided In The
        Specification ........................................................................................11

i

Table of Contents
(continued)

Page

D.   Terms Should Not Be Construed In A Manner That
     Excludes Preferred Embodiments.......................................................................12

E.   Terms Should Be Construed To Preserve Their Validity .....................................12

F.   Although Less Relevant, The Prosecution History Should
     Be Considered.....................................................................................................13

G.   Extrinsic Evidence May Be Useful To Construe Claim
     Terms ...................................................................................................................15

IV.  LITERAL INFRINGEMENT AND THE DOCTRINE OF
     EQUIVALENTS ARE NOT RELEVANT TO CLAIM
     CONSTRUCTION AND THUS GLENMARK'S CLAIM
     CONSTRUCTION POSITIONS SHOULD BE REJECTED .........................................15

V.   CONSTRUCTION OF THE DISPUTED TERMS SUPPORTS
     AN ORDINARY MEANING FOR MOST OF THE TERMS...........................................16

A.   "Wherein The Lotion Is Free Of Mineral Oil And White
     Soft Paraffin" Is Clear And Unambiguous On Its Face ........................................17

     1.   "Mineral Oil" Is The Type Identified In The Patent ..................................17

          a.   The Specification Inherently Identifies
               Mineral Oil As Mineral Oil, USP To A
               POSA .................................................................................................18

          b.   Mineral Oil And Light Mineral Oil Are Not
               The Same .........................................................................................19

          c.   Glenmark's Documents Distinguish Mineral
               Oil, USP From Light Mineral Oil, NF.............................................20

     2.   The Claimed Lotion Is Free Of The Mixture Of
          Mineral Oil AND White Soft Paraffin......................................................20

B.   "About" Is Clear And Unambigous In This Case...................................................23

     1.   "About" Is Defined In The Specification...................................................23

     2.   Terms Related To "About" ........................................................................25

C.   "Comprising" Is Clear And Unambiguous ...........................................................25

ii

Table of Contents
(continued)

Page

1.   The Definition Of "Comprising" Is Well Settled In
     Patent Law .................................................................................................... 25

2.   "Further Comprising" Should Be Construed
     Consistently.................................................................................................... 27

3.   "Comprising . . . The Balance In Water" Should Be
     Construed Consistently .................................................................................. 27

D.   "Wherein The Lotion Cause More Vasoconstriction . . ." Is
     Not A Limitation.................................................................................................... 30

E.   Additional Terms Disputed By Glenmark ............................................................. 31

     1.   A Topical Lotion............................................................................................ 31

     2.   The Remainder Of The Terms Glenmark Disputes ...................................... 32

VI.   CONCLUSION.................................................................................................................... 34

## TABLE OF AUTHORITIES

### CASES

*800 Adept, Inc. v. Murex Securities, Ltd.,*
  539 F.3d 1354 (Fed. Cir. 2008) ........................................................................................15

*ACTV, Inc. v. Walt Disney Co.,*
  346 F.3d 1082 (Fed. Cir. 2003) ........................................................................................11

*Amgen Inc. v. Hoechst Marion Roussel, Inc.,*
  314 F.3d 1313 (Fed. Cir. 2003) ........................................................................................26

*AstraZeneca AB v. Mutual Pharmaceutical Co., Inc.,*
  384 F.3d 1333 (Fed. Cir. 2004) ........................................................................................12

*Athletic Alternatives v. Prime Mfg., Inc.,*
  73 F.3d 1573 (Fed. Cir. 1996) ..........................................................................................13

*Boss Control, Inc. v. Bombardier, Inc.,*
  410 F.3d 1372 (Fed. Cir. 2005) ........................................................................................11

*In re Burke, Inc.,*
  1993 WL. 92579 (Fed. Cir. 1993) .....................................................................................26

*Cargill Inc. v. Sear Petroleum & Transp. Corp.,*
  334 F. Supp. 2d 197 (N.D.N.Y. 2004).............................................................................28

*CIAS, Inc. v. Alliance Gaming Corp.,*
  504 F.3d 1356 (Fed. Cir. 2007) ...................................................................................25, 27

*C.R. Bard, Inc. v. U.S. Surgical Corp.,*
  388 F.3d 858 (Fed. Cir. 2004) .......................................................................................2, 33

*CollegeNet, Inc. v. ApplyYourself, Inc.,*
  418 F.3d 1225 (Fed. Cir. 2005) ........................................................................................25

*Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.,*
  559 F.3d 1308 (Fed. Cir. 2009) ........................................................................................16

*Cultor Corp. v. A.E. Staley Mfg. Co.,*
  224 F.3d 1328 (Fed. Cir. 2000) ........................................................................................24

*Cybor Corp. v. FAS Technologies, Inc.,*
  138 F.3d 1448 (Fed. Cir. 1998) ........................................................................................15

Page

*Ecolab, Inc. v. FMC Corp.*,
  569 F.3d 1335 (Fed. Cir. 2009) ..................................................................................13, 32

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
  93 F.3d 1572 (Fed. Cir. 1996) ..............................................................................................16

*Flex-Rest, LLC v. Steelcase, Inc.*,
  455 F.3d 1351 (Fed. Cir. 2006) ..............................................................................................10

*Forest Labs, Inc. v. Abbott Labs.*,
  239 F.3d 1305 (Fed. Cir. 2001) ..............................................................................................11

*Gart v. Logitech, Inc.*,
  254 F.3d 1334 (Fed. Cir. 2001) ..............................................................................................12

*Georgia-Pacific Corp. v. United States Gypsum Co.*,
  195 F.3d 1322 (Fed. Cir. 1999) ..............................................................................................26

*IMS Tech. Inc. v. Haas Automation Inc.*,
  206 F.3d 1422 (Fed. Cir. 2000) ..............................................................................................15

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004) ..............................................................................................11

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001) ..............................................................................................10

*Intervet America, Inc. v. Kee-Vet Labs., Inc.*,
  887 F.2d 1050 (Fed. Cir. 1989) ........................................................................................13, 14

*Inverness Med. Switz. GmbH v. Warner Lambert Co.*,
  309 F.3d 1373 (Fed. Cir. 2002) ................................................................................................9

*Loctite Corp. v. Ultraseal Ltd.*,
  781 F.2d 861 (Fed. Cir. 1985) ................................................................................................14

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996) ....................................................16

*Medrad, Inc. v. MRI Devices Corp.*,
  401 F.3d 1313 (Fed. Cir. 2005) ..............................................................................................29

*Minton v. National Ass'n of Sec. Dealers, Inc.*,

Page

336 F.3d 1373 (Fed. Cir. 2003) ............................................................................................30

*Multiform Desiccants, Inc. v. Medzam Ltd.*,
   133 F.3d 1473 (Fed. Cir. 1998) ..........................................................................................24

*Novo Industries, L.P. v. Micro Molds Corp.*,
   350 F.3d 1348 (Fed. Cir. 2003) ....................................................................................8 n.5

*Nystrom v. TREX Co. Inc.*,
   424 F.3d 1136 (Fed. Cir. 2005) ..........................................................................................10

*O2 Micro Int'l Ltd. V. Beyond Innovation Technology Co.*
   521 F.3d 1351 (Fed. Cir. 2008) ..........................................................................................33

*Ortho-McNeil Pharm. Inc. v. Caraco Pharm. Labs., Ltd.*,
   476 F.3d 1321 (Fed. Cir. 2007) ..........................................................................................24

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ................................. 2, 9 & n.6, 10, 11, 12, 13, 15, 22, 26, 29

*Pirelli Cable Corp. v. Ciena Corp.*,
   988 F. Supp. 424 (D. Del. 1997)..........................................................................................16

*Primos, Inc. v. Hunter's Specialties, Inc.*,
   451 F.3d 841 (Fed. Cir. 2006) ............................................................................................29

*Rambus Inc. v. Infineon Tech. Ag*,
   318 F.3d 1081 (Fed. Cir. 2003) ....................................................................................13, 14

*SanDisk Corp. v. Memorex Prods., Inc.*,
   415 F.3d 1278 (Fed. Cir. 2005) ..........................................................................................25

*In re Schulze*,
   346 F.2d 600 (Ct. Customs & Patent Appeals 1965) ............................................................32

*Sinorgchem Co. v. United States Int'l Trade Commission*,
   511 F.3d 1132 (Fed. Cir. 2007) ..........................................................................................24

*United States Surgical v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997) ..........................................................................................33

*Tate Access Floors, Inc. v. Maxcess Techs.*,
   222 F.3d 958 (Fed. Cir. 2000) ....................................................................................12, 13

Page

*Texas Instruments v. United States ITC,*
    988 F.2d 1165 (Fed. Cir. 1993) ...............................................................................................30

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) .................................................................................10, 11, 12, 22

*Vivid Technologies, Inc. v. Am. Sci. & Eng'g, Inc.,*
    200 F.3d 795 (Fed. Cir. 1999) .................................................................................................26

## STATUTES

37 C.F.R. § 314.95 .................................................................................................................3

## I.   THE CLAIM CONSTRUCTION DISPUTES BEFORE THE COURT

Pursuant to the Scheduling Order entered in this action, Plaintiff Nycomed US Inc.
("Nycomed") respectfully submits this brief in support of its constructions for the terms in
dispute from claims 1-19 of United States Patent No. 7,300,669 ("the '669 patent", Ex. 1), the
patent in suit.[1]  The '669 patent is directed to a novel and non-obvious lotion invention that has
particular components, including the active ingredient fluticasone, a type of corticosteriod.  The
lotion is used to treat a variety of dermatological conditions such as eczema.  One embodiment
of the patent's invention is Cutivate® 0.05% Fluticasone Propionate Lotion ("Cutivate Lotion"),
a product owned, marketed and patented by Nycomed, which is sold in the United States and
available by prescription only.

The claim construction process should be relatively simple here.  With just a few
exceptions, the applicants for the patent, in conjunction with the Patent Office Examiner, used
common, well-known terms to describe the invention in the claims in a manner that is well-
understood by a person of ordinary skill in the art.[2]  There are four critical aspects of the '669
patent that guide the construction of the disputed terms:

- The claimed invention is a topical fluticasone lotion that *must include* the following
  ingredients: Fluticasone, Fatty Alcohol (or mixture of Fatty Alcohols), at least one
  Skin Conditioning Agent, Propylene Glycol, and Water.

- The concentrations of each ingredient can vary (higher or lower) as long as the
  change in concentration does not alter the function of the individual ingredient or
  composition.

- Although additional ingredients may be added (and in certain embodiments – *must* be
  added), the lotion *cannot include* Mineral Oil USP *and* White Soft Paraffin together.

---

[1] Exhibits 1 through 25 are appended to the accompanying Declaration of Marcus A. Colucci and
are reference throughout this brief as "Ex. __".

[2] Nycomed's Final Exchange Of Claim Terms To Be Construed And Proposed Constructions is
attached as Exhibit 2.

1

- The core invention is a unique combination of ingredients. The inherent properties and benefits of the invention, such as an increased potency (i.e., vasoconstriction) of the lotion are simply the inherent results and intended uses of the unique combination of ingredients – not something that is added to the lotion (i.e., increased vasoconstriction and other inherent benefits are not limitations).

Nycomed has proposed simple and clear constructions in view of the invention claimed in the '669 patent and in accordance with the governing claim construction principles set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), and its progeny, in order to reflect the true scope of the disputed claims. Nycomed's constructions are consistent with the intrinsic record, including the language of the claims, the patent's specification, and the prosecution history. Further, Nycomed's constructions are also consistent with the meanings that a person of ordinary skill in the art would have understood the terms to have at the time inventions were made.

In contrast, Defendants Glenmark Generics Ltd., and Glenmark Generics Inc., USA (collectively "Glenmark") adopt constructions that are convoluted, inconsistent, and detached from the plain meanings of the terms. Tellingly, Glenmark has been changing its proposed definitions for many disputed terms throughout the course of this litigation. (*See e.g.*, Ex. 4). The reason for Glenmark's inconsistencies and failure to acknowledge the plain meanings of the claim terms is obvious — Glenmark seeks to alter the scope of the claims to avoid a finding of patent infringement. Thus, Glenmark's attempts to substitute complex dictionary definitions, never considered by the inventors or the Patent Office Examiner, for simple and well-understood terms, and to also read vast amounts of alleged arguments from the prosecution history into the claims. These constructions fail as a matter of law. Nothing useful is to be gained by Glenmark's attempt with many of the terms to substitute synonyms and alternative wording for the actual clear and unambiguous language used by the inventors and Patent Office Examiner. *See C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 863 (Fed. Cir. 2004) ("Courts . . .

2

regularly forgo detailed dictionary analyses if the term is [] commonplace. . . [M]erely rephrasing or paraphrasing the plain language of a claim by substituting synonyms does not represent genuine claim construction." Citing *Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1207 (Fed. Cir. 2002)).

Additionally, claim construction and infringement analysis, whether literal or under the doctrine of equivalents, are separate legal and factual inquires. Glenmark's attempt through claim construction to conflate the two separate doctrines and have the Court include infringement determinations in the claim construction invites legal error. For these reasons and others set forth below, Glenmark's proposed constructions should be rejected.

### A.   The Origin Of The Claim Construction Disputes Is The Failure Of Glenmark's Mineral Oil Noninfringement Defense At The Pleading Stage

When required by the Hatch Waxman Act to set forth all of their bases in defense against the '669 patent, Glenmark alleged ███████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████

Specifically, in July of 2008, Glenmark invoked the provisions of the Hatch Waxman Act by filing an Abreviated New Drug Application ("ANDA") with the Food and Drug Adminstration ("FDA") seeking to market a generic copy of Nycomed's Cutivate Lotion. After its ANDA was accepted for review in October of 2008, Glenmark was required under the Hatch Waxman Act to inform Nycomed of all of its bases for proceeding against the patent in a Notice Letter. 37 C.F.R. § 314.95. ███████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

3

████████████████████████████████████████████████████████████████.

Glenmark did not allege the patent was invalid or unenforceable or any other grounds of noninfringement. Given the disclosure requirements of the Hatch Waxman Act, Glenmark's lack of additional bases is evidence that all of the other remaining claim limitations are met and infringed by Glenmark's proposed generic product.

After receiving Glenmark's Notice Letter, Nycomed asked Glenmark for documentary support for its noninfringement assertion in the Notice Letter. ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████

After considerable negotiation, Glenmark sent Nycomed portions of its ANDA that confirmed that the Glenmark proposed generic product would infringe the '669 patent claims and

4

that the assertions of noninfringement were false. ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

**B.     Glenmark's New And Untimely Defenses Are The Reasons That Glenmark
Now Puts Most If Not All Of The Claim Terms In Issue**

After Nycomed's Complaint was filed, Glenmark began asserting a stream of new and

dubious defenses. Each of these defenses involved reading the claim terms out of context and

substituting new, unsupported constructions for the terms that ignored the plain and ordinary

meanings of the terms. Thus, there are a large number of claim terms for which Glenmark seeks

a construction, which is unnecessary, and, under the prevailing precedent, improper as a matter

of law.

**II.     THE UNDERLYING EVIDENCE CONCERNING CLAIM CONSTRUCTION
SUPPORTS THE USE OF THE ORDINARY MEANING OF THE TERMS OR
THE DEFINITIONS OF THE TERMS USED IN THE SPECIFICATION**

**A.     The Lotion Invention Was Novel And Not Predicted**

Nycomed's '669 patent teaches and claims a novel fluticasone lotion. In 2005, Nycomed

purchased the rights to the invention claimed in the '669 patent from GlaxoSmithKline PLC

("GSK"), a leading research-based pharmaceutical company.

At the time of the invention, a fluticasone cream was on the market, although its actual

formulation was not publicly known. No fluticasone lotion was sold. Conventional wisdom

suggested that a fluticasone cream would be more potent than a fluticasone lotion. (Palmieri

Decl. ¶¶ 9-10)[3]. Because fluticasone is already a relatively low potency corticosteroid, there was no motivation to formulate an even less potent fluticasone lotion.

The belief that a cream is more potent than a lotion was based on the physical and chemical differences in creams and lotions. (*Id.*) There are a variety of factors that distinguish lotions from creams, including the ratios of oil, water, emulsifiers, *etc.*, which affect the manner in which the lotion or cream will spread/flow on the skin, loss of water on drying, dilution properties, transmittance of visible light, and general overall appearance. (*Id.* at ¶12). The study of how lotions and creams (and other matter) flow is known as rheology. Rheology is one of the most discriminating properties separating lotions and creams and requires an analysis of viscosity(cps) and shear rate versus shear stress as well as other properties. (*Id.* at ¶13). A medicated product that is formulated to have a higher viscosity will allow the product and medication to remain on the skin for a longer period of time. As a result, the total amount of medication that permeates into the skin will increase. Also, the greater the viscosity, the more likely the product will form what is known as an occlusive barrier on the surface of the skin. The occlusive barrier prevents loss of moisture thereby hydrating the skin. The increased hydration helps the medication to permeate into the skin. Based on this knowledge, it was believed that a fluticasone cream, with greater viscosity and occlusive properties, would be more potent than a lotion which is less viscous and has reduced occlusive properties. *Id.* at ¶¶ 9-10).

At the time of the invention, scientists working on behalf of GSK were studying different formulations of fluticasone cream (now sold under the brand name Cutivate® Cream). As the GSK scientists developed different formulations of fluticasone cream, the patent reports that they noticed interesting trends in the data. Through further research and studies, the GSK scientists

---

[3] References to "Palmieri Decl. ___" refer to the Declaration of Anthony Palmieri III, Ph.D. submitted herewith in support of Plaintiff's Opening Claim Construction Brief.

were surprised in their ability to develop a fluticasone lotion with potency greater than predicted.
Further, another surprising benefit they discovered of fluticasone lotion over fluticasone cream is
reduced systemic absorption. Systemic absorption of topical corticosteroids can produce a
condition known as reversible hypothalamic-pituitary-adrenal ("HPA") axis suppression, which
has negative side effects. [4]

### B.   Identification Of The Asserted Claims

Nycomed has asserted claims 1-19 of the '669 patent against Glenmark. There are two
independent claims (1 and 19) and sixteen dependent claims (2-18). A dependent claim includes
the limitation set forth in the claim *and* incorporates all the limitations in the claim(s) that it
relies upon.

#### 1.   Independent Claims 1 And 19

The two independent claims in the '669 patent are claims 1 and 19. Independent claims 1
and 19 cover pharmaceutical fluticasone compounds formulated in lotions. Representative
independent claim 1 of the '669 patent is set forth below with the most relevant disputed claim
terms in bold italic font:

1. A *topical lotion, comprising*:

*about* 0.005 to 1.0 wt. % fluticasone, or a pharmaceutically acceptable salt or
ester thereof;

*about* 4.0 to 6.0 wt. % of a $C_{14}$-$C_{20}$ fatty alcohol or mixtures thereof;

*about* 1.0 to 5.0 wt. % of at least one first skin conditioning agent;

*about* 5.0 to 15.0 wt. % propylene glycol; and

*the balance in water*;

---

[4] These include the potential for glucocorticosteroid insufficiency after withdrawal from
treatment. Manifestations of Cushing's syndrome, hyperglycemia, and glucosuria can also be
produced in some patients by systemic absorption of topical corticosteroids while on treatment.
This is a significant benefit of the invention that is described in the patent.

7

wherein the lotion is free of *mineral oil and white soft paraffin*, and

wherein the lotion causes more vasoconstriction when applied to living human skin than does application of a cream containing mineral oil or soft white paraffin, or both, the cream containing the same amount of the fluticasone or the pharmaceutically acceptable salt or ester thereof.

### 2.   Dependent Claims 2-18

Claims 2-18 are dependent claims. Claims 2-18 ultimately depend on claim 1. Claim 18 is a dependent claim that should be construed to rely on independent claim 17.[5] Representative dependent claim 4 is set forth below with the most relevant disputed claim terms in bold italic font:

4. The lotion of claim 1 *further comprising* dimethicone in an amount up to *about* 5.0 wt. %.

As explained above, a dependent claim includes the limitation recited in the claim *and* the limitations in the claim(s) that it relies upon. Thus, claim 4 would cover a topical lotion that must include (and exclude) all the ingredients in claim 1 *and* the lotion *must* include dimethicone.

### C.   The '669 Patent Specification Is The Best Guide

The specification of the '669 patent is "the single best guide to the meaning of a disputed term" and confirms that Nycomed's proposed construction of the disputed claim terms is

---

[5]  There is a typographical error in claim 18. Claim 18, a dependent claim, refers to "the method of claim 15." Claim 15, however, is not a method claim. The only method claim that claim 18 can be referring to is independent claim 17. It is clear that claim 18 should read "the method of Claim 17." In fact, the Examiner corrected the error, although the correction was not made when the patent was re-typed by the Patent Office. (Ex. 10 at N004405). The Court can and should correct this typographical error when, as here, "(1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1354 (Fed. Cir. 2003).

correct.[6] The '669 patent specification teaches a person of ordinary skill in the art how to formulate a fluticasone lotion. Additionally, the specification of the '669 patent explicitly and unambiguously defines critical disputed claim terms that Nycomed has incorporated into its proposed constructions. The relevant portions of the specifications are discussed in Section V below.

### D.     The Prosecution History Is Less Relevant

The prosecution history of claims 1-19, although less relevant to claim construction, further confirms that Nycomed's proposed construction of the disputed claim terms is correct.[7] *Phillips*, 415 F.3d at 1317 ("a court 'should also consider the patent's prosecution history, if it is in evidence.' . . . Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes.") (citations omitted); *see also Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380-82 (Fed. Cir. 2002) (the ambiguity of the prosecution history make it less relevant to claim construction). The relevant portions of the prosecution history are discussed in Section V. below.

---

[6] *Phillips*, 415 F.3d at 1321 ("the specification is 'the single best guide to the meaning of a disputed term,' and . . . the specification 'acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.'" (citation omitted)).

[7] During prosecution of the '669 patent, sixty-four claims were filed. Claims 1-44 were cancelled. Claims 45-63, however, issued and were re-numbered as claims 1-19 (respectively) in the issued '669 patent. For convenience of the Court, references to prosecution of claims 45-63 will be referred to by their issued claim numbers (e.g., prosecution of original claim number 45 will be referred to as prosecution of issued claim 1).

9

## III.   THE LAW OF CLAIM CONSTRUCTION SUPPORTS NYCOMED'S APPROACH TO THE CLAIMS BY ASSERTING THE ORDINARY MEANING OF THE TERMS EXCEPT IN THE FEW CASES WHERE THE TERMS WERE PROVIDED SPECIFIC DEFINITIONS IN THE SPECIFICATION

### A.   Claim Terms Are Presumptively Given Their Ordinary Meaning

Claim construction "begin[s] and remain[s] centered on the language of the claims themselves, for it is that language that the patentee chose to use." *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). A claim term is to be construed in accordance with what the inventors "intended to envelope with the claim." *Phillips*, 415 F.3d at 1326; *Flex-Rest, LLC v. Steelcase, Inc.*, 455 F.3d 1351 (Fed. Cir. 2006) (claims must be read in the context of the problem the invention was intended to solve.).

"[T]he words of a claim 'are generally given their ordinary and customary meaning'" *Phillips*, 415 F.3d at 1312-13 (quoting *Vitronics*, 90 F.3d at 1582 (Fed. Cir. 1996), as understood by "a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Id.* at 1313 (citing *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)); *see also Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 986 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

The claims must also "'be read in view of the specification, of which they are a part.'" *Phillips*, 415 F.3d at 1315 (quoting *Markman*, 52 F.3d at 979). Indeed, the specification is usually dispositive because "it is the single best guide to the meaning of a disputed term." *Id.* (quoting *Vitronics*, 90 F.3d at 1582); *Nystrom v. TREX Co. Inc.*, 424 F.3d 1136, 1142 (Fed. Cir. 2005) (claim terms should be interpreted in light of the invention as set forth in the specification). Unlike the prosecution history, which "represents an ongoing negotiation

10

between the PTO and the applicant," the specification is the "final product of that negotiation" and thus offers unparalleled clarity as to the meaning of a claim term. *Phillips*, 415 F.3d at 1317.

Accordingly, in the end, the construction that "most naturally aligns itself" with the patent specification is the one that should be adopted by the Court. *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

**B.      Dependent Claims Provide Guidance For Interpreting Independent Claims**

In addition to looking at the particular claim at issue, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Phillips*, 415 F.3d at 1314 (citing *Vitronics*, 90 F.3d at 1582). "[W]here claims use different terms, those differences are presumed to reflect a difference in the scope of the claims." *Forest Labs, Inc. v. Abbott Labs.*, 239 F.3d 1305, 1310 (Fed. Cir. 2001). Additionally, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315 (citing *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004).). "[T]he context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms" *Phillips*, 415 F.3d at 1314; *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003).

**C.      The Definition Of A Term May Be Provided In The Specification**

Patent applicants may be their own lexicographers. *Boss Control, Inc. v. Bombardier, Inc.*, 410 F.3d 1372, 1377 (Fed. Cir. 2005); *Vitronics*, 90 F.3d at 1582. "All that is required is that the patent applicant set out the different meaning in the specification in a manner sufficient to give one of ordinary skill in the art notice of the change from ordinary meaning." *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004). "Even when guidance is not provided in explicit definitional format, the specification may define

11

claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." *Phillips*, 415 F.3d at 1321 (quoting *Irdeto Access, Inc. v. Echostar Satellite Corp.,* 383 F.3d 1295, 1300 (Fed. Cir. 2004)). Thus, a claim term may be defined in the specification by implication, "such that the meaning may be 'found in or ascertained by a reading of the patent documents.'" *AstraZeneca AB v. Mutual Pharm. Co.*, 384 F.3d 1333, 1339-1340 (Fed. Cir. 2004) (citations omitted).

## D.   Terms Should Not Be Construed In A Manner That Excludes Preferred Embodiments

A claim construction that excludes a preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support." *Vitronics*, 90 F.3d at 1583. On the other hand, "broad claims supported by the written description should not be limited in their interpretation to a preferred embodiment." *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1343 (Fed. Cir. 2001); *Phillips*, 415 F.3d at 1323 ("we have repeatedly warned against confining the claims to those embodiments"). "[A]lthough the specification may well indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than such embodiments." *Tate Access Floors, Inc. v. Maxcess Techs.*, 222 F.3d 958, 966 (Fed. Cir. 2000).

## E.   Terms Should Be Construed To Preserve Their Validity

Even though validity analysis is not a regular component of claim construction, "claims should be construed to preserve their validity," when "the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous" and that "the proposed claim construction is 'practicable,' is based on sound claim construction principles, and does not revise or ignore the explicit language of the claims." *Phillips*, 415. F.3d at 1327 (citations omitted). In such cases, the Court should "look to whether it is reasonable to infer that the PTO

12

would not have issued an invalid patent, and that the ambiguity in the claim language should therefore be resolved in a manner that would preserve the patent's validity." *Id.*

F.     **Although Less Relevant, The Prosecution History Should Be Considered**

In addition to the words of the claim and the specification, a Court "should also consider the patent's prosecution history, if it is in evidence." *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980). "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

There are several reasons that the prosecution history may be less relevant. For example, the prosecution history may support different interpretations. *See, e.g., Athletic Alternatives Inc. v. Prince Mfg., Inc.* 73 F.3d 1573, 1580 (Fed. Cir. 1996) (finding "[t]wo strong and contradictory interpretive strands thus run through the patent's prosecution history" and therefore "the prosecution in this case is thus unhelpful as an interpretive resource for construing the [] claim limitation").

Additionally, hyperbolic or erroneous statements made by an attorney during prosecution of the patent do not necessarily result in prosecution history disclaimer. *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1343 (Fed. Cir. 2009). "Facially inaccurate" remarks during prosecution are generally disregarded in view of clearly different claim language. *Rambus Inc. v. Infineon Tech. Ag*, 318 F.3d 1081, 1090 (Fed. Cir. 2003). It is especially true when the Examiner was not misled or deceived and the erroneous remark was not made at the end of the prosecution. *Intervet America, Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1054 (Fed. Cir. 1989). For example, in *Rambus*, during prosecution, the attorney made a general introductory statement regarding new claims, stating that all of the new claims contain the same three new features.

13

*Rambus*, 318 F.3d at 1090. However, in fact, all three features were not present in each of the new claims. *Id.* The court refused to find disclaimer from this erroneous statement, finding that "[t]his incorrect statement in the prosecution history does not govern the meaning of the claims…The claim language itself controls the bounds of the claim, not a facially inaccurate remark during prosecution." *Id.*

As another example, in *Intervet*, during prosecution, the attorney made amendments to three of the claims by adding a specific claim limitation in response to the Examiner's rejection, but did not include the same amendment in the rest of the claims. *Intervet*, 887 F.2d at 1054. However, the attorney made an unqualified and untrue statement that the rest of the claims were restricted by the particular limitation. *Id.* The claims were eventually issued, some with the limitation, some without. *Id.* The Federal Circuit rejected the district court's construction that read the limitation into the claims without such because of the attorney's remarks, and found that:

> When it comes to the question of which should control, an erroneous remark by an attorney in the course of prosecution of an application or the claims of the patent as finally worded and issued by the Patent and Trademark Office as an official grant, we think the law allows for no choice. The claims themselves control.
>
> . . .
>
> the patentee was granted broad claims in spite of the statement by the attorney that he was amending them, though he never did so. The examiner was not misled or deceived. The erroneous remark was not the end of the prosecution. The examiner was fully aware of what claims he was allowing. Subsequent to the erroneous remark, the examiner had two telephone interviews with the attorney and made two "examiner's amendments" to the claims himself before formally allowing [] the claims of the patent. . . . The presumption of validity under 35 U.S.C. § 282 carries with it a presumption the examiner did his duty and knew what claims he was allowing. In any event, the claims as allowed are what we have to deal with and it is not for the courts to say that they contain limitations which are not in them. *E.I. Du Pont De Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988). *See also Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861 (Fed. Cir. 1985).

14

*Id.*

### G.    Extrinsic Evidence May Be Useful To Construe Claim Terms

If intrinsic evidence cannot resolve the dispute in construing a claim term, extrinsic evidence, such as dictionaries or treatises, may be consulted by the court to assist in claim construction, but it is less reliable than intrinsic evidence because extrinsic evidence lends meaning to claim terms only in the abstract, rather than within the specialized context of the patent itself. *Phillips,* 415 F.3d at 1317-18. Accordingly, extrinsic evidence of a claim term's meaning may assist in claim construction, but it cannot be used to contradict a claim meaning that is unambiguous in view of the intrinsic record. *Id.* at 1324.

### IV.    LITERAL INFRINGEMENT AND THE DOCTRINE OF EQUIVALENTS ARE NOT RELEVANT TO CLAIM CONSTRUCTION AND THUS GLENMARK'S CLAIM CONSTRUCTION POSITIONS SHOULD BE REJECTED

Glenmark jumps the gun and seeks to argue the applicability of literal infringement and the Doctrine of Equivalents during claim construction. It is well established that "[a]n infringement analysis requires two steps: (1) claim construction to determine the scope and meaning of the asserted claims, and (2) a comparison of the properly construed claims with the allegedly infringing device or method to determine whether the device or method embodies every limitation of the claims." *IMS Tech. Inc. v. Haas Automation Inc.*, 206 F.3d 1422, 1429 (Fed. Cir. 2000) (citing *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (*en banc*)). The first step, claim construction, which the Court determines in the *Markman* claim construction hearing, is purely a matter of law. *Cybor,* 138 F.3d at 1454 (citing *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd,* 517 U.S. 370 (1996)); *see also 800 Adept, Inc. v. Murex Sec., Ltd.,* 539 F.3d 1354, 1363 (Fed. Cir. 2008). In contrast, the second step, a determination of infringement, either literal or under the doctrine of equivalents, is a question of fact and happens after claim construction. *See Crown Packaging*

15

*Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308. 1312 (Fed. Cir. 2009) (citing *IMS Tech.*, 206 F.3d at 1429).

For example, Glenmark's proposed definition of "topical lotion" improperly attempts to have infringement determinations made now. For example, it states, "A lotion suitable for administration . . . and which excludes for purposes of both literal infringement and infringement under the Doctrine of Equivalents . . . all hydrocarbon occlusive agents, . . ." (*See also*, Ex. 6, Glenmarks disputed terms 9 and 11-14). Glenmark seeks to cause error by presenting infringement arguments relating to the infringement and the Doctrine of Equivalents in the guise of claim construction. Whether Glenmark infringes under the Doctrine of Equivalents or otherwise involves questions of facts which are not the proper subject of claim construction. *See. e.g., Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572. 1583 (Fed. Cir. 1996) (vacated district court's dismissal of case at the close of the *Markman* hearing requiring findings regarding triable issues of facts); *Pirelli Cable Corp. v. Ciena Corp.*, 988 F. Supp. 424 (D. Del. 1997) (removed language regarding equivalents from its *Markman* opinion for want of fact findings).

## V. CONSTRUCTION OF THE DISPUTED TERMS SUPPORTS AN ORDINARY MEANING FOR MOST OF THE TERMS

The parties did not narrow their claim construction disputes during the fact discovery period despite the provision for the exchange of preliminary positions on May 27 and final positions on July 27.[8]  During the two month period, Nycomed's constructions remained

---

[8] The Scheduling Order (Doc 30-2) set a date for (1) "5/27/09  Preliminary Exchange of Claim Terms to be Construed and Proposed Constructions: positions not binding and can be amended based on a written statement of the good faith reason for the amendment up until final claim construction positions are due." and (2) "7/27/09  Parties exchange final claim construction positions."  Despite significant changes to its claim construction positions, Glenmark failed to provide the "good faith reason" for its amendments in a timely or substantive manner.  (Ex. 7).

16

virtually the same, while Glenmark's changed in significant ways, although never in a manner that would resolve any of the disputes. (Exs. 2 and 6 (the parties' submissions); Ex. 4 (compares Glenmark's preliminary and final positions)). Most of the disputed terms, however, are still not relevant to resolving the issues in this lawsuit.

Nycomed has grouped and focused the discussion below on the most relevant terms that affect the issues in this lawsuit as follows: (1) "wherein the lotion is free of mineral oil and white soft paraffin"; (2) "about" (which is grouped with several other related terms); (3) "comprising" (which is grouped with "further comprising", "comprising ... balance in water" and three related terms); (4) "wherein the lotion causes more vasoconstriction . . ."; and (5) the additional terms that do not readily lend themselves to grouping and that generally do not require extensive analysis by the Court.

### A. "Wherein The Lotion Is Free Of Mineral Oil And White Soft Paraffin" Is Clear And Unambiguous On Its Face

| Claim Term In Context | Nycomed's Construction |
| --- | --- |
| wherein the lotion is free of mineral oil and white soft paraffin | the lotion is free of Mineral Oil, USP and white soft paraffin |

#### 1. "Mineral Oil" Is The Type Identified In The Patent

The parties' dispute concerning "mineral oil" is focused on whether the term should be construed in the context of the patented invention (i.e., dermatological formulations) as Nycomed contends or whether the term should be construed in the abstract as Glenmark contends. Nycomed contends that mineral oil means Mineral Oil, USP, consistent with the meaning that mineral oil would have to a person of ordinary skill in the art and in the context of the '669 patent.

17

Glenmark, however, seeks to broaden the meaning of mineral oil, ignoring the goals and purposes of the claimed invention in a manner contrary to Federal Circuit law. Glenmark claims that "mineral oil" can be any "mixture of liquid hydrocarbons obtained from petroleum," and "includes all types of mineral oil, including light mineral oil." Under Glenmark's construction, mineral oil could refer to kerosene or diesel fuel (a mixture of liquid hydrocarbons). Glenmark's position is untenable. (Palmieri Decl. ¶¶ 15-16).

### a.   The Specification Inherently Identifies Mineral Oil As Mineral Oil, USP To A POSA

The specification (in the "Background Of The Invention") explains that the claimed invention is fluticasone lotion with improved properties compared to the existing fluticasone propionate cream (0.05%) sold under the tradename Cutivate® Cream. (Ex. 1, at 1:15-32). The "Background Of The Invention" further identifies the ingredients of Cutivate® Cream, including mineral oil. Although the patent does not state that Cutivate® Cream includes Mineral Oil, USP, a person of ordinary skill in the art ("POSA") would immediately recognize that the mineral oil in Cutivate® Cream is Mineral Oil, USP.[9] The reason why is simple — Cutivate® Cream is a prescription drug that must be approved by the FDA to be sold in the United States. As required by FDA standards, the term mineral oil refers to Mineral Oil, USP. (Palmieri Decl. ¶¶ 16 and 19; see also, Nycomed's Complaint ¶¶ 38-44). Similarly, reference to mineral oil in the specification (e.g., column 2, lines 21-32) necessarily refers to Mineral Oil, USP and not some random form of hydrocarbons (as proposed by Glenmark). (Palmieri Decl. ¶¶ 16, 17 and 19).

---

[9] As explained in the Complaint (¶¶ 38-45), USP (United States Pharmacopeia) and NF (National Formulary) are official compendia used by the FDA and other organizations, which contain standards for product ingredients. These compendia contain monographs which, *inter alia*, define each product ingredient.

18

### b.    Mineral Oil And Light Mineral Oil Are Not The Same

A person of ordinary skill in the art would understand that mineral oil is different from light mineral oil. (Palmieri Decl. ¶¶ 15-18 and 21-22). Mineral oil and light mineral oil are sold as separate products because they have different physical properties and characteristics. (*Id., see also* Exs. 9, 11). In fact, mineral oil is divided into seven different subcategories and light mineral oil is divided into nine different subcategories. (Ex. 9). The subcategories are based, in part, on the different viscosity and specific gravity ranges which can have a significant impact on the potency and physical properties of the lotion. (Palmieri Decl. ¶¶ 17-18). For example, the range of viscosity for light mineral oil is 39.5-145 (ASTM D) while the range for mineral oil is 180-525 (ASTM D), an average four fold increase. (Ex. 9).

Because the '669 patent is directed to a lotion rather than a cream, the physical difference between Mineral Oil, USP and Light Mineral Oil, NF is particularly important. (Palmeiri Decl. ¶¶ 11-17). As explained above, the rheology of a composition is the most relevant factor in differentiating between lotions and creams. (*Id.*) Thus, the viscosity, specific gravity and other physical properties are all critical. (*Id.*) A person skilled in the art reading the patent would be keenly aware of these physical and chemical differences and would not consider light mineral oil to be mineral oil.

Moreover, mineral oil and light mineral oil have different Material Safety Data Sheets and separate monographs in USP-NF. (Exs. 9, 11-13). As their designations indicate, mineral oil appears in USP (United States Pharmacopeia) and light mineral oil appears in NF (National Formulary). Ingredients in USP generally have a pharmacological effect while those in NF generally do not. (Palmieri ¶¶ 19-22). This division is consistent with the distinctly different properties of mineral oil and light mineral — specifically, mineral oil is identified as occlusive in authoritative references whereas light mineral oil is not.

19

      c.     Glenmark's Documents Distinguish Mineral Oil, USP From Light Mineral Oil, NF



    2.    **The Claimed Lotion Is Free Of The Mixture Of Mineral Oil *AND* White Soft Paraffin**

The parties have a fundamental dispute over the meaning of "*and*" for the claim term: "wherein the lotion is free of mineral oil *and* white soft paraffin [("MO *and* SWP")].["][10] The

---

[10] Soft White Paraffin is also referred to as White Soft Paraffin.

patent does not indicate that the word "**and**" should be given any special meaning. The American Heritage Dictionary predictably defines "**and**" to mean "together with or along with...." (Ex. 20). Therefore, a lotion where MO is not together with SWP (*e.g.*, Glenmark's lotion) is effectively free of the "MO *and* SWP" combination.

To illustrate this point, a diagram is provided below. In the diagram, lotion A contains MO and not SWP, lotion B does not contain MO or SWP, lotion C contains SWP and not MO, and lotion D contains MO and SWP. Lotion D, highlighted in purple, is the only lotion where MO is together with SWP (and the only lotion that is not free of "MO *and* SWP"), and therefore it is the only lotion that would not infringe this claim term. Although lotion A contains MO, it is still free of the "MO *and* SWP" combination. Likewise, lotion C contains SWP, but it is free of the "MO *and* SWP" combination. Further, Lotion B is free of both "MO *and* SWP." Because lotions A through C are free of the "MO *and* SWP" combination, they would infringe this claim term.



21

Knowing that it infringes the ordinary meaning of the term, Glenmark seeks to re-write it to mean something else. Glenmark's proposed construction improperly breaks the claim term "mineral oil and white soft paraffin" apart into separate elements. Essentially, Glenmark asks this Court to substitute "*and*" with "*or*." Glenmark argues in its proposed construction (and non-infringement position) that a lotion containing MO *OR* SWP does not infringe. (Ex. 21, pp. 3 and 6-7 (Interrogatory No. 15)). As explained above, this re-writing of the element must fail.

Nycomed's proposed construction is in fact consistent with the prosecution history and the Hill reference (discussed further below), examples and preferred embodiments in the patent (e.g., Examples 3-5, 12-16) (Ex. 1, at Cols. 4-9), which contain MO but are free of the "MO *and* SWP" combination.[11] *See Phillips*, 415 F.3d at 1316 (the construction that "most naturally aligns" itself with the patent specification is the one that should be adopted). Glenmark cannot read out the preferred embodiments of the claim. *Vitronics*, 90 F.3d at 1585.



One aspect of the prosecution history provides context to this claim term and confirms its construction. The Patent Office Examiner repeatedly rejected the pending claims over the Hill

---

[11] The specification states that "[t]he lotion may also be free of mineral oil and/or white soft paraffin," thereby disclosing embodiments that may be free of both or either. Col. 3, lines 16-17. The claims, however, are explicitly not directed to the "or" embodiments that may be free of either mineral oil *or* white soft paraffin because the claims state (with emphasis added), "free of mineral oil *and* white soft paraffin."

PCT application reference. Exhibit 4. Hill disclosed compositions containing fluticasone such as "ointments, lotions, creams, powders, drops (e.g., eye or ear drops) or sprays." *Id.* at 2. Hill taught preparations with mineral oil *and* white soft paraffin:

> Ointments may normally be prepared by melting white soft paraffin, (white petrolatum) incorporating any additives e.g., surfactants and solvents, and blending in a slurry of the drug in a minimum quantity of liquid paraffin [another phrase for "Mineral Oil, USP"]. . . .
>
> Creams may normally be prepared by combining the oily phase of an ointment as a melt as described above, . . . *Id.*

Hill became one of the principal prior art references that the Examiner cited against the claims. It was one of the few references that disclosed the use of fluticasone. The applicants explained how the Hill reference was overcome by the claim term:

> Hill states (p. 2) that "[c]ompositions of the invention can conveniently by formulated in a conventional manner . . . in the form of creams or ointments. . . . Ointments may normally be prepared by melting soft white paraffin (white petrolatum) . . .and blending in a slurry of the drug in a minimum quantity of liquid paraffin." Liquid paraffin is synonymous with mineral oil, as is well known in the art. <u>Hill thus teaches only a composition that is based on soft white paraffin and contains mineral oil.</u> Example 1, the sole example therein, teaches adding 10% soft white paraffin to the composition. <u>Therefore Hill does not teach or suggest a formulation that explicitly includes the negative limitation of an absence of mineral oil and white soft paraffin.</u> Hill teaches only a fluticasone formulation with a hydrocarbon (mineral oil or petrolatum) occlusive agent. July 26, 2007 Amendment, p. 6 (emphasis added). Example 7.

Thus, the negative limitation term, "free of mineral oil and white soft paraffin," unsurprisingly means what it says. The phrase excludes from the claims only lotions that have both mineral oil *and* white soft paraffin.

### B.    "About" Is Clear And Unambigous In This Case

#### 1.    "About" Is Defined In The Specification

| Claim Term In Context | Nycomed's Construction |
|---|---|
| about | includes values, e.g., weight percents, proximate to the recited range that are equivalent in terms of the functionality of the individual ingredient, the |

23

> | composition or the invention. |
> | --- |

Nycomed's proposed construction of "about" is quoted from the '669 patent

specification:

> Unless indicated otherwise herein, the term "about" is intended to include values,
> e.g., weight percents, proximate to the recited range that are equivalent in terms of
> the functionality of the individual ingredient, the composition or the invention.
> (Ex. A, Col. 1, lns. 54-61).

As discussed in Section III above, the Federal Circuit has stated "a definition set forth in

the specification governs the meaning of the claims. *Sinorgchem Co. v. U.S. Int'l Trade*

*Comm'n*, 511 F.3d 1132, 1138 (Fed. Cir. 2007); see, e.g., *Cultor Corp. v. A. E. Staley Mfg. Co.*,

224 F.3d 1328, 1330 (Fed. Cir. 2000) ("When the specification explains and defines a term used

in the claims, without ambiguity or incompleteness, there is no need to search further for the

meaning of the term."); *Multiform Desiccants, Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1478 (Fed.

Cir. 1998).

Not only does Glenmark ignore the definition set forth in the specification, Glenmark

ignores the ordinary meaning of "about." The Federal Circuit has stated that in cases where

"about" has not been specifically defined, the ordinary meaning is as follows:

> The use of the word "about," avoids a strict numerical boundary to the specified
> parameter. Its range must be interpreted in its technological and stylistic context.
> We thus consider how the term ... was used in the patent specification, the
> prosecution history, and other claims.

*Ortho-McNeil Pharm. Inc. v. Caraco Pharm. Labs., Ltd.* 476 F.3d 1321, 1326 (Fed. Cir. 2007).

Glenmark's application of the term "about," however, is disconnected from the technical

and stylistic context. Glenmark's proposed application of about (as reflected in Glenmark's

disputed term numbers 11-14) is nothing more than plus(+) or minus(-) a tenth of a percent

24

(0.1%) — regardless of the initial value.[12]   For example, Glenmark states that about 1.0 % could mean 0.9 %, which equates to a 10% difference.  *(See* Ex. 6 proposed definition No. 10).  Glenmark then states that about 15% could mean 15.1%, only a 0.67% difference.  A person would not consider the term "about" to mean a fixed amount of plus or minus 0.1%.  Rather, a person would understand the term "about" to be flexible — the degree to which it can vary may depend on the context (e.g., the initial referenced value, information in the specification).

### 2.   Terms Related To "About"

The disputed terms identified on Exhibit 24 all use the term "about."  Nycomed's proposed constructions for these terms adopt the definition of "about" defined in the specification.

### C.   The Term "Comprising" Is Clear And Unambiguous

| Claim Term In Context | Nycomed's Construction |
|---|---|
| A topical lotion comprising; | including, but not limited to |

### 1.   The Definition Of "Comprising" Is Well Settled In Patent Law

The parties' different constructions of the term "comprising" may not at first blush appear significant.  However, the subtle differences may indeed become important in application of the terms.  Nycomed's proposed definition of comprising captures the full definition of "including, *but not limited to*" and comports with the Federal's Circuit's law.  *See, e.g., CIAS. Inc. v. Alliance Gaming Corp.,* 504 F.3d 1356, 1360 (Fed. Cir. 2007) ("In the patent claim context the term 'comprising' is well understood to mean 'including but not limited to.'")  Numerous cases state that the transitional phrase "comprising" does not foreclose additional elements.  *See, e.g., CollegeNet, Inc. v. ApplyYourself,* Inc., 418 F.3d 1225, 1235 (Fed. Cir.

---

[12] Glenmark inconsistently proposes one definition of "about" in its disputed term number 3, but then applies a very different construction of "about" in disputed term numbers 11-14. Ex. 6.

2005) (the use of "comprising" is "open-ended," and does not exclude "additional, unrecited elements"); *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1284 (Fed. Cir. 2005) ("Neither includes, nor comprising, forecloses additional elements that need not satisfy the stated claim limitations."); *Amgen, Inc. v. Hoechst Marian Roussel, Inc.* 314 F.3d 1313, 1345-46 (Fed. Cir. 2003) ("Comprising is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim.") (citation omitted); *Vivid Technologies, Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 811, (Fed. Cir. 1999) ("the signal 'comprising' [] is generally understood to signify that the claims do not exclude the presence in the accused apparatus or method of factors in addition to those explicitly recited."); *Georgia-Pacific Corp. v. United States Gypsum Co.*, 195 F.3d 1322, 1327-28 (Fed. Cir. 1999) ("'comprising' ... is inclusive or open-ended and does not exclude additional unrecited elements or method steps."); *In re Burke, Inc.*, 1993 WL 92579, *4 (Fed. Cir. Mar. 31,1993) ("As a general rule, 'comprising' and 'including' are open-ended terms which cover the structural elements recited plus additional elements." (citing 2 D. Chisum, *Patents* § 8.06[1] (1992)). Thus, the topical lotion may include ingredients in addition to those listed in claims themselves as reflected in Nycomed's proposed construction.

Additionally, the term "comprising" in claim 1 must allow for the possibility of additional ingredients as recited in other claims of the '669 patent. As discussed in Section III above, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Phillips*, 415 F.3d at 1314. Certain dependent claims in the '669 patent incorporate all the limitations of claim 1 plus the addition of other ingredients. For example, claim 2 states: "The lotion of claim 1 further comprising about 0.25 to 3 wt. % of at least one surfactant." In order to construe claims 1 and 2

26

consistently, the term, "comprising" must be defined as open-ended (*i.e.*, not limited to the ingredients listed in the claim).

Glenmark's proposed definition: "characterized by," and to some extent "including" and "containing," suggests that additional ingredients may not be added to the topical lotion and it is contrary to well settled law. *CIAS*, 504 F.3d at 1360 ("In the patent claim context the term 'comprising' is well understood to mean 'including but not limited to'.").

2.  **"Further Comprising" Should Be Construed Consistently**

| Claim Term In Context | Nycomed's Construction |
| --- | --- |
| The lotion of claim [[ further comprising | further including, but not limited to |

The disputed term "further comprising" is found in dependent claims 2 – 6, 9, 10, 12, and 13. As explained above, "comprising" and now, "further comprising," is an open ended transitional phrase that does not foreclose the possibility of additional ingredients.

3.  **"Comprising . . . The Balance In Water" Should Be Construed Consistently**

| Claim Term In Context | Nycomed's Construction |
| --- | --- |
| comprising...the balance in water | including, but not limited to, a large proportion of water |

In the context of the '669 patent, the term "comprising . . . the balance in water" simply means "including, but not limited to, a large proportion of water." Nycomed's construction is consistent with the specification and the ordinary meaning, and it harmonizes the independent and dependent claims. In contrast, Glenmark's proposed construction is self-contradictory and renders the dependent claims meaningless contrary to Federal Circuit law. *Phillips*, 415 F.3d at 1327.

The patent specification (at column 1, line 62 through column 2, line 5) states the following:

27

> Another aspect of the present invention is a topical fluticasone lotion… The *lotion comprises* about 0.005 to 1.0 wt. % fluticasone…; about 1.0 to 10.0 wt. % of a $C_{16}$-$C_{20}$ fatty alcohol, or mixtures thereof; about 1.0 to 5.0 wt. % of at least one skin conditioning agent; about 5.0 to 15.0 wt. % of propylene glycol; up to about 10.0 wt. % mineral oil or soft white paraffin, *and the balance being water. The lotion optionally contains additives* such as preservatives and buffers. (emphasis added) (Ex. 1).

Thus, the specification describes a lotion that comprises various ingredients with the balance being in water. The specification states that the lotion may optionally contain additives, thereby definitively showing that that the term "balance in water" does not foreclose the possibility of additives.

A large portion of a lotion's volume will be water. The term "balance in water" is a convenient and concise way to draft the claim to mean that a large percentage of the lotion will be water. Because other ingredients may be included in the lotion, it is unwieldy to otherwise identify the specific volume or percentage of water. Therefore, the term "balance in water" is used to indicate that a large proportion of the lotion is water.

Further, Nycomed's construction of "comprising . . . the balance in water" is consistent with Federal Circuit law. The term "balance" does not foreclose the inclusion of unlisted ingredients that do not materially affect the basic and novel properties of the invention. *See Cargill Inc. v. Sears Petroleum & Transp. Corp.*, 334 F. Supp. 2d 197, 220-21 (N.D.N.Y. 2004) ("It should also be noted that the use of such closed-ended terms as balance, or 'consisting essentially of' can allow for the presence of 'unlisted ingredients that do not materially affect the basic and novel properties of the invention.'" (quoting *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1354 (Fed. Cir. 1998)).

In contrast, Glenmark's proposed construction is detached from the plain meaning of the term, is self-contradicting, and violates well-settled Federal Circuit law. Glenmark contends that a lotion "comprising…the balance in water" should mean "[o]ther than the ingredients specified

28

in the claim, *and with the exception of the possible presence of impurities, buffers, or preservatives*, the remainder of the lotion is only water." (emphasis added). Glenmark's proposed construction is thus arbitrary and allows for some exceptions (*i.e.*, additional ingredients) but not others. Moreover, Glenmark's construction would render *every* dependent claim meaningless. For example, dependent claim 2 claims a lotion that includes "at least one surfactant." (*See also* Ex. 1, dependent claims 3-6 and 9-13, 15-18). According to Glenmark, dependent claim 2 cannot include a surfactant as it is not one of the exceptions. Not surprisingly, Glenmark's generic fluticasone lotion has a surfactant..

As a matter of law, Glenmark's proposed construction cannot be correct, because such a construction would create conflicting meanings for claim 1 and its dependent claims. *See Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1317 (Fed. Cir. 2005) ("We must not interpret an independent claim in a way that is inconsistent with a claim which depends from it.") (quoting *Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1445 (Fed. Cir.1997)); *see also Phillips*, 417 F.3d at 1327 ("claims should be construed to preserve their validity," when "the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous" and that "the proposed claim construction is 'practicable,' is based on sound claim construction principles, and does not revise or ignore the explicit language of the claims.")

Glenmark's proposed definition would also exclude *every* preferred embodiment and Example from the patent specifications (*see e.g.*, Examples 6 and 11 shown below). It is also well established that the Court "should not normally interpret a claim term to exclude a preferred embodiment." *Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 848 (Fed. Cir. 2006) (citing *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1341 (Fed. Cir. 1999)).

Example 6

A topical fluticasone propionate lotion in accordance with the present invention was prepared having the following composition:

| Ingredient | Wt. % |
|---|---|
| Fluticasone Propionate | ... |
| ... | ... |
| Propylene carbonate | ... |
| Ethyl alcohol | ... |
| ... | ... |
| Propylene Glycol | ... |
| Citric Acid Salt solution | ... |
| Sodium Citrate | ... |
| Isopropanol | ... |
| Water | ... |

Example 11

A topical fluticasone propionate lotion in accordance with the present invention was prepared having the following composition:

| Ingredient | Wt. % |
|---|---|
| ... | ... |
| ... | ... |
| ... | ... |
| ... | ... |
| ... | ... |
| ... | ... |
| ... | ... |
| ... | ... |
| ... | ... |
| ... | ... |

## D. "Wherein The Lotion Causes More Vasoconstriction . . ." Is Not A Limitation

Nycomed contends that the clause, "wherein the lotion causes more vasoconstriction . .

.." is not limiting to the scope of claims in the '669 patent. Specifically, when a "wherein" or

"whereby" clause merely states the intended or inherent result of the claimed invention, it is not

construed as a claim limitation. *See e.g., Minton v. National Ass'n of Sec. Dealers, Inc.*, 336

F.3d 1373, 1381 (Fed. Cir. 2003) ("[A] whereby clause in a method claim is not given weight

when it simply expresses the intended results of a process step positively recited."); *Texas

Instruments v. United States ITC*, 988 F.2d 1165, 1172 (Fed. Cir. 1993) ("A 'whereby' clause

that merely states the result of the limitations in the claim adds nothing to the patentability or

substance of the claim."). That is the case here. The clause, "wherein the lotion causes more

vasoconstriction when applied to living human skin than does application of a cream containing

mineral oil or soft white paraffin, or both, the cream containing the same amount of the

fluticasone or the pharmaceutically acceptable salt or ester thereof," merely states the inherent

and intended results of the application of the present invention, and, therefore, should not be

construed as a claim limitation as Glenmark contends.

During prosecution of issued claims 1 and 19, the clause "wherein the lotion causes more

vasoconstriction . . ." was added in a July 24, 2007 Response. The July 24 2007 Response states:

30

" the claimed lotion is shown to *inherently possess* [greater vasoconstriction], as was disclosed in the application as originally filed (see Tables 1 and 2). Therefore, the lotion as claimed in claims 45 and 63 as amended herein *constitutes the same invention as already has been searched and examined in this application; these amendments do not constitute a different invention* that was not earlier constructively elected by prosecution on the merits of claims to another invention." (Ex. 22). The Examiner agreed because he did not perform a new search and examination as would have been otherwise required.

### E.    Additional Terms Disputed By Glenmark

#### 1.    A Topical Lotion

Nycomed's proposed construction of "topical lotion" is consistent with the plain and ordinary meaning of the phrase. There are no valid infringement, invalidity or unenforceability arguments surrounding this term.

Glenmark's final proposed construction for "topical lotion" violates nearly every canon of claim construction (e.g., claims should be construed in accordance with their plain meaning, presence of a dependent claims that adds a particular limitation gives rise to a presumption that the limitation is question is not present in the independent claims, claims should be construed to preserve their validity). (*Supra* Section III.E) Glenmark's proposed construction also renders certain dependent claims meaningless and others invalid. The Federal Circuit has frequently stated that a construction that fails to give meaning to terms is often incorrect. The Federal Circuit has also warned that claims should be construed to preserve validity. Glenmark ignores these most basic canons of claim construction.

Glenmark's proposed construction also seeks to import limitations into the claims. Glenmark cannot identify any portions of the specification that support such restrictions and instead relies on out-of-context statement made during prosecution. In particular, Glenmark

31

seeks to import limitations based on statements made during prosecution that were not relevant to overcoming prior art. (*See* Supra I.A). The Federal Circuit has cautioned against relying upon prosecution history "which is an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, [because] it often lacks the clarity of the specification and thus is less useful for claim construction purposes and less helpful."

Further, the prosecution statements cannot amount to disclaimers of claim scope. *See,* MPEP 716.01(c)(II) ("The arguments of counsel cannot take the place of evidence in the record. *In re Schulze*, 346 F.2d 600, 602 (CCPA 1965). Examples of attorney statements which are not evidence and which must be supported by an appropriate affidavit or declaration include . . . unexpected results...."); *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1342-43 (Fed. Cir. 2009) (where the examiner recognized erroneous statements made by attorney "the district court did not err when it declined to apply prosecution history disclaimer because its prosecution statements cannot reasonably be interpreted as disclaimers when they are properly read in the context of the entire patent disclosure and prosecution history").

Glenmark ignores these basic rules of claim construction and provides a misleading construction for the phrase. It is telling that Glenmark's proposed constructions changed significantly from its initial proposed construction. Glenmark provided no good faith basis (because it cannot) for changing its proposed construction as required by the Scheduling Order. (Ex. 7, *see also* Exs. 4-6).

## 2. The Remainder Of The Terms Glenmark Disputes

The remainder of the terms identified by Nycomed on Exhibit 25 have a well understood meaning to a person of ordinary skill in the art. Nycomed contends that the terms listed therein are self-explanatory and do not need to be redefined with more complicated or new and different words than those used by the inventors and the Examiner, which were never vetted by the

32

process of application drafting and application review and prosecution, as Glenmark proposes.
"Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify
and when necessary to explain what the patentee covered by the claims, for use in the
determination of infringement." *U.S. Surgical v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir.
1997). Nothing is gained by replacing clear language with synonyms or other words that were
not contemplated by the inventors, applicants or Examiner. *See C.R. Bard, Inc. v. U.S. Surgical
Corp.*, 388 F.3d 858, 863 (Fed. Cir. 2004) ("Courts . . . regularly forgo detailed dictionary
analyses if the term is [] commonplace. . . [M]erely rephrasing or paraphrasing the plain
language of a claim by substituting synonyms does not represent genuine claim construction").

      Further, the terms are not vital to resolving the disputed issues in this lawsuit. The
Federal Circuit has stated that "district courts are not (and should not be) required to construe
every limitation present in a patent's asserted claims." *O2 Micro International Ltd. v. Beyond
Innovation Technology Co.* 521 F.3d 1351, 1362 (Fed. Cir. 2008). Claim construction "is not an
obligatory exercise in redundancy." *U.S. Surgical Corp.*, 103 F.3d at 1568.

33

## VI.    CONCLUSION

For the reasons stated above, Nycomed's constructions of the terms in the claims of the

'669 patent should be adopted by the Court as a matter of law.

Dated:  August 17, 2009

By:

Donald L. Rhoads, Esq.
Nicholas L. Coch, Esq.
Albert Chen, Esq.
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 715-9100
Facsimile:  (212) 715-8000

*Attorneys for Plaintiff Nycomed US Inc.*

34